UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

 v.             Case No. 2:22-cr-117(3)
                JUDGE EDMUND A. SARGUS, JR.

DAVID E. PRICE,

    Defendant.

## OPINION AND ORDER

In October 2022, the Government charged Defendant David E. Price by a Superseding Indictment with drug distribution, drug trafficking conspiracy, and firearms offenses. (ECF No. 148.) It named 22 co-defendants in the same Superseding Indictment and charged them with similar crimes. (*Id.*) Since the Superseding Indictment, many of Mr. Price's co-defendants have signed plea agreements. Recently, the Government charged Mr. Price by a Second Superseding Indictment with additional crimes, including conspiracy to commit sex trafficking and sex trafficking by force, fraud, or coercion. (ECF No. 778.)

This matter is before the Court on Mr. Price's Motion to Suppress.[1] (Mot. ECF No. 484.) The Government opposes his Motion. (Resp. ECF No. 494.) For the below reasons, the Mr. Price's Motion is the **DENIED**.

---

[1] Mr. Price requested an evidentiary hearing on his Motion. (Mot. PageID 1515.) The Court gave the parties a chance to file supplemental briefs on whether an evidentiary hearing was necessary. (*See* ECF Nos. 644, 662.) The Court found that an evidentiary hearing was unnecessary, stated that it would decide Mr. Price's Motion on the papers, and explained its reasoning in a separate Opinion and Order. (ECF No. 663.)

I.  **BACKGROUND**

Mr. Price asks the Court to suppress all evidence obtained by law enforcement pursuant to the execution of two separate search warrants at 139 South Princeton Avenue, Columbus, Ohio 43222. (Mot. PageID 1515.) He challenges various aspects of the affidavits in support of the search warrants. (*Id.*)

The first affiant was Columbus Division of Police ("CPD") Detective Brandon Harmon. Detective Harmon swore to the facts contained in an August 3, 2021 affidavit ("August Affidavit," ECF No. 484-1), and Franklin County Municipal Court Judge David Tyack digitally signed the warrant authorizing the search on August 3, 2021.[2] (*Id.*) The search was executed the day after. (Resp. PageID 1595.)

The second affidavit was sworn to by Special Agent Trace S. Way of the United States Department of Homeland Security Investigations on June 28, 2022 ("June Affidavit") before Magistrate Judge Chelsey M. Vascura in this Court. (ECF No. 484-2, PageID 1564.) Magistrate Judge Vascura authorized the warrant the same day (*id.*) and the search took place the next day (ECF No. 662, PageID 2508).

The Court summarizes each Affidavit and search in turn.

A.  **The August Affidavit and Search**

The August Affidavit contains six pages of single-spaced text. (August Affidavit.) There, Detective Harmon explained that he was a member of the Central Ohio Human Trafficking Task

---

[2] In its Response to the Motion to Suppress, the Government submits that "Judge Tyack authorized the search warrant on August 3, 2022 and it was executed the following day." (Resp. PageID 1595.) The signature line indicates, however, that Judge Tyack authorized the warrant in 2021, not 2022. (August Affidavit, PageID 1525.) Mr. Price also states that he seeks to suppress "all evidence obtained by law enforcement pursuant to the execution of two separate search warrants at a residence at 139 South Princeton . . . the first on August 4, 2021 and the second on June 29, 2022." (ECF No. 662, PageID 2508.) The Court concludes that the reference to "August 3, 2022" in the Government's Response is a typo.

Force ("Task Force"). (*Id.* PageID 1524.) The Task Force received a tip from CPD Officer Clouse, who had received several complaints of drug and prostitution activity at a house located at 3235 Sullivant Avenue, Columbus, OH 43204. (*Id.*) Sources told Officer Clouse that there was a structured criminal enterprise involving drug and sex trafficking taking place there and advised that Mr. Price was the individual overseeing the enterprise. (*Id.*) A record search revealed that Mr. Price had a significant criminal history, including of being abusive toward and trafficking women. (*Id.* PageID 1524–25.)

The August Affidavit continues on to explain how, in April and May 2021, CPD officers observed Mr. Price driving a silver Buick SUV and the same Buick parked at or close to 3235 Sullivant. (*Id.* PageID 1525.) The officers observed the Buick parked behind the residences of 137–139 South Princeton, too. (*Id.*) The Buick was registered to Mr. Price's daughter. (*Id.*) Detectives learned that 139 South Princeton was owned by Cordell Washington, a co-defendant. (*Id.*)

In June 2021, investigators conducted physical and electronic surveillance at 139 South Princeton, and observed Mr. Price entering and exiting the residence. (*Id.* PageID 1526.) The Buick was seen parked there many times. (*Id.*) After receiving a search warrant for cellular phone ping information, the Task Force collected much cell phone data connecting Mr. Price to 139 South Princeton. (*Id.*)

The August Affidavit also describes information obtained from two confidential sources. The first confidential source ("CS #1") was interviewed by Officer Susanna Bell on June 12, 2021. (*Id.*) CS #1 explained that Mr. Price was the main driver of the Buick. (*Id.*) He or she detailed how Mr. Price was a heavy crack-cocaine user, and that he or she had observed crack-cocaine, methamphetamine, heroin, and Xanax inside 139 South Princeton. (*Id.*) CS #1 shared that there were three to four pistols and at least one rifle inside 139 South Princeton, and that Mr. Price kept

large amounts of currency at his own residence inside dresser drawers and duffel bags. (*Id.*) CS #1 detailed how Mr. Price would bring drug-addicted women to 139 South Princeton and provide them drugs in exchange for sexual favors. (*Id.* PageID 1527.)

While conducting surveillance at 139 South Princeton, investigators collected trash from receptacles directly behind the residence and found plastic baggies that contained residue consistent with illegal drugs. (*Id.*) Field tests confirmed that the substances in the baggies contained illegal drugs. (*Id.* PageID 1527–28.)

The August Affidavit references a second confidential informant ("CS #2") who met with the Task Force on July 28, 2021. (*Id.* PageID 1528.) CS #2 explained that Mr. Price lived at 139 South Princeton, sold illegal drugs from the residence, solicited sexual favors from women, and locked women up. (*Id.* PageID 1528.)

Judge Tyack authorized the search warrant on August 3, 2021 and the search was executed the next day. (*Id.* PageID 1523; Resp. PageID 1595.) The Government represents that following items were recovered during the search: "80.62 grams of cocaine, 28 grams of fentanyl, 3 milligrams of Xanax, three firearms, and approximately $9,701.00." (Resp. PageID 1596.) Identification for Mr. Price, handwritten notes, and drug paraphernalia were also recovered. (*Id.*) Mr. Price was inside the residence at the time the search warrant was executed. (*Id.*)

      **B.**     **The June Affidavit and Search**

The June Affidavit is 35 pages long (with attachments) and contains 62 paragraphs. (June Affidavit.) Special Agent Way began by describing his experience and training; specifically, his participation in state and federal investigations involving illegal possession of firearms and narcotics, narcotics trafficking, human trafficking, and prostitution. (*Id.* PageID 1535–36.) Special Agent Way summarized his knowledge about how drug traffickers commonly function and execute their trafficking enterprise. (*Id.* PageID 1541–44.)

4

Next, Special Agent Way provided a long history of the investigation into the drug trafficking organization ("DTO") led by Patrick Saultz (another co-defendant) and Mr. Washington. (*Id.* PageID 1544–54.) The background discussion about the DTO included information learned during the 2021 investigation of 139 South Princeton and seven other "DTO Houses," as well as Mr. Price. (*Id.*) Cell phone ping information linked Mr. Price to 139 South Princeton. (*Id.* PageID 1549–1551.) A description of the trash pulls that occurred in July 2021 was also included as historical information. (*Id.*)

Special Agent Way summarized interviews that occurred with S.B.—who is now deceased because of a drug overdose—but did not specify when the interviews took place. (*Id.*) He explained that "[i]nvestigators had previously identified [S.B.] as an individual who had direct knowledge of this DTO from one of the original tips they had received from CPD when they initiated their investigation into the trafficking portion of their case." (*Id.*) He also noted that S.B. had "previously disclosed that she was a victim of the sex trafficking going on with the main targets related to this DTO." (*Id.*)

Over the course of "multiple interviews," S.B. shared that Mr. Price was selling drugs inside 139 South Princeton and providing women with drugs in exchange for sexual favors. (*Id.*) S.B. disclosed that Mr. Saultz and Mr. Washington would supply Mr. Price with those drugs, and in the DTO hierarchy, Mr. Price was directly underneath Mr. Saultz and Mr. Washington. (*Id.*) S.B. detailed that she sometimes went inside the residence of Mr. Saultz to get narcotics, consisting of crack-cocaine, fentanyl, Xanax, and crystal meth. (*Id.*) She also took narcotics to Mr. Price at 139 South Princeton. (*Id.*)

The June Affidavit also explained that Special Agent Way or those working with him on the DTO investigation obtained a federal court order on May 17, 2022, allowing for the interception of wire and electronic communication for three telephone lines that Mr. Washington

utilized. (*Id.* PageID 1559–1562.) Then, on June 9, 2022, they obtained a separate federal court order for the interception of wire and electronic communications for a telephone line used by Mr. Saultz. (*Id.*) The intercepted communications confirmed that Mr. Washington and Mr. Saultz were the leaders of the DTO. (*Id.*) The intercepted communications also included calls involving Mr. Price and the use of 139 South Princeton as a DTO location. (*Id.*)

Based on Special Agent Way's experience investigating narcotics traffickers, he believed coded words and phrases used on such calls were referring to narcotics, currency, and locations. (*Id.*) Drug traffickers know that their telephone conversations are susceptible to interception and rarely overtly discuss their illegal activities. (*Id.*; *e.g.*, *id.* PageID 1560, "PRICE asks, 'Uh, will you give me uh, a basketball? I'll be there in a few'. ALLISON responds, 'Huh'. PRICE responds, 'I'm on my way' and ALLISON says 'Alright'. Your affiant believes this call is indicative of drug trafficking.").

Magistrate Judge Vascura authorized the search warrant on June 28, 2022 (*id.* PageID 1564) and the search was executed the next day (Resp. PageID 1598). The Government states that 6.339 grams of cocaine, drug paraphernalia, and multiple cell phones were recovered during the search. (*Id.*)

## II. ANALYSIS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "At the very core" of the Fourth Amendment is the right to "be free from unreasonable governmental intrusions." *Kyllo v. United States*, 533 U.S. 27, 31 (2001).

Probable cause exists for a search when "the totality of the circumstances presented in a warrant affidavit would lead a person of reasonable caution to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Smith*, No. 21-1457, 2022 WL 4115879, at *3 (6th Cir. Sept. 9, 2022), *cert. denied*, 143 S. Ct. 2499 (2023) (cleaned up) (citing *Florida v. Harris*, 568 U.S. 237, 243–44 (2013); *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A probable cause "nexus between the place to be searched and the evidence sought" must be present. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc).

An inquiry into probable cause requires a "flexible, all-things-considered approach"—"turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Harris*, 568 U.S. at 244 (citation omitted). Probable cause is not a high bar. *United States v. Waide*, 60 F.4th 327, 335 (6th Cir. 2023) (citing *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021)). Courts must pay "great deference" to an issuing judge's determination, *McLane Co. v. E.E.O.C.*, 581 U.S. 72, 84 (2017), *as revised* (Apr. 3, 2017), and overturn an issuing judge's decision only if he or she "arbitrarily exercised his or her authority," *United States v. Christian*, 925 F.3d 305, 311–12 (6th Cir. 2019) (en banc). "This deferential approach ensures that an issuing court's discretion will only be reversed if it was arbitrarily exercised." *United States v. Crawford*, 943 F.3d 297, 305 (6th Cir. 2019) (internal citations and quotations omitted).

Finally, even if a court finds a Fourth Amendment violation occurred, the United States Supreme Court has "rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 141 (2009) (citing *United States v. Leon*, 468 U.S. 897, 905–06 (1984); *Arizona v. Evans*, 514 U.S. 1, 10, 13–14 (1995); *Pennsylvania Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 363 (1998)). For it to be warranted, the "benefits of deterrence must outweigh the costs." *Id.* (citing *Leon*, 468 U.S. at 910).

Turning to the Motion before the Court, Mr. Price makes two main arguments. (Mot. PageID 1519–20.) First, he argues that information in the Affidavits was stale. (*Id.*) Second, he contends that the Affidavits failed to establish the reliability of the informants who provided information. (*Id.*) The Court analyzes each argument in turn.

### A. The information in the Affidavits was not stale.

Mr. Price asserts that Detective Harmon made only two allegations of drug trafficking in the August Affidavit. (Mot. PageID 1518.) One being based on information from an unidentified informant more than two months before the August Affidavit was signed and the other, based on information from an unidentified informant about a week before the August Affidavit was signed.[3] (*Id.*) As for the June Affidavit, there is no indication in it as to when the uncorroborated information from the deceased informant was provided, he contends. (*Id.*) Mr. Price argues that the information is stale because "the affidavit"—he does not specify which one—fails to indicate when the drug trafficking took place. (*Id.* PageID 1518–19.) He also emphasizes that information about drug crimes goes stale quicker than in other crimes because "drugs are usually sold and consumed in prompt fashion." (*Id.*) (citing *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)).

The Government counters that Mr. Price's Motion improperly focuses on a few paragraphs of the Affidavits, while ignoring significant corroboration between informants themselves and from "various records, trash pulls, electronic and wire interceptions, phone pings, physical and electronic surveillance, and historical reports." (Resp. PageID 1605.) It urges that the Affidavits "contained ample evidence that the defendant was involved in a drug trafficking organization and

---

[3] The Court assumes Mr. Price was referring to CS #1 and CS #2, respectively, although the interview with CS #1 occurred less than two months before the August Affidavit on June 12, 2021. (August Affidavit, PageID 1526.)

8

other nefarious activities, including sex trafficking." (*Id.* PageID 1604.) When one considers the totality of the circumstances described by the affiants, says the Government, it is clear that Mr. Price was part of a drug trafficking organization. (*Id.* PageID 1604.) The Government also argues that the information in the Affidavits was not stale. (*Id.*)

Mr. Price's focus on a few paragraphs in the August Affidavit and the June Affidavit, which span six pages and 35 pages, respectively, is too narrow of a reading. When the Affidavits are reviewed in their entirety (separately), the circumstances presented in them would lead a reasonable person to believe there was a fair probability that drugs and evidence of sex trafficking would be found at 139 South Princeton in August 2021 and June 2022. *See Smith*, 2022 WL 4115879, at *3 (explaining when probable cause for a search exists). The Affidavits both describe a complex and calculated drug and sex trafficking operation.

The information Mr. Price argues was stale was not. The interview with CS #2 occurred only about one week before the August 2021 search, which is close in time. The interview with CS #1 was less than two months before the August Affidavit. True, the sources did not specify, or the Affidavits failed to note, when the drug and sex trafficking activities took place. Similarly, a reader of the June Affidavit does not know when the interviews with S.B. took place.

But the Sixth Circuit has instructed that "we judge a warrant affidavit 'on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added.'" *United States v. Moore*, 999 F.3d 993, 998 (6th Cir. 2021) (*United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000)). There is no set time frame by which a piece of information becomes stale. *See United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998). Whether information is stale in the context of a search warrant turns on several factors:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?), (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and (4) the

place to be searched (mere criminal forum of convenience or secure operational base?).

*Frechette*, 583 F.3d at 378 (quoting *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006)); *Spikes*, 158 F.3d at 923.

Mr. Price argues (correctly) that information related to drug crimes can go stale more quickly than other types of information because "drugs are usually sold and consumed in a prompt fashion." (Mot. PageID 1517); *see Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (quoting *Frechette*, 583 F.3d at 378)). But he ignores and fails to analyze the above *Frechette* considerations. The Court does, and observes that the Affidavits describe a complex, ongoing criminal conspiracy. *See United States v. Young*, 847 F.3d 328, 347 (6th Cir. 2017) (explaining that the nature of the drug trafficking scheme is a regenerating conspiracy). The players in the conspiracy were entrenched. Detective Harmon explained that he learned 139 South Princeton was owned by Mr. Washington. He also described observing Mr. Price's Buick being parked at 139 South Princeton several times. Special Agent Way identified eight properties including 139 South Princeton that were linked to the DTO and intertwined to one another through the DTO. These locations were not "mere criminal forums of convenience; but rather, the locations [were] at the heart of the criminal charge." *See Abboud*, 438 F.3d at 574 (internal quotation omitted).

The Affidavits included information about sex trafficking offenses that Detective Harmon, Special Agent Way, and others suspected Mr. Price participated in. Evidence pertaining to such offenses is likely to be found on cell phones that a defendant uses to communicate with co-defendants and victims. Cell phone evidence is not perishable or consumable. *See United States v. Pope*, 852 F. App'x 945, 952 (6th Cir. 2021) ("[u]nlike drugs, an Internet-capable device is not easily consumable or perishable"). So investigators expected to find cell phone evidence too.

Mr. Price's staleness arguments fail.

10

B. **The Affidavits established the reliability of the informants.**

Mr. Price next contends that the Affidavits failed to establish the reliability of the informants who provided information against his interests. (Mot. PageID 1519.) He relies on *United States v. Frazier* to posit that an affidavit replying on a confidential informant must contain "substantial independent police corroboration" when it does not reference "any indicia of the informant's reliability." (*Id.* (citing 423 F.3d 526, 532 (6th Cir. 2005).) Mr. Price asserts the Affidavits contain no facts supporting the confidential sources' reliability and because they are based almost exclusively on information provided by the confidential sources (in his opinion), the allegations from the sources that he was a drug dealer, without more, are insufficient. (*Id.*)

The Government counters that because the sources used in both Affidavits were not named or are now deceased does not automatically make them unreliable, it just requires that the reliability be determined utilizing a different method. (Resp. PageID 1606.) The Government explains that CPD knew the identity of the informants (one named, two confidential) and therefore their tips were more reliable. (*Id.* PageID 1606–07.) The Government then points to corroboration in the Affidavits including physical surveillance, cellular phone pings, and trash pulls. (*Id.* PageID 1607.) The sources themselves also corroborated each other. (*Id.*)

Mr. Price's unreliability argument is undercut by the above finding that probable cause was not based solely on the information from the confidential sources. There was substantial corroboration among the sources, the information they shared, and information learned from physical surveillance, cellular phone pings, and trash pulls. CS #1 and CS #2, and the S.B. all recounted that Mr. Price gave drug-addicted women drugs in exchange for sexual favors.

Moreover, the use of "confidential source" or "CS" rather than "unknown source" or "unidentified source" is pertinent—"confidential" implies a tipster whose identity is known to the police, but is kept secret. *Compare United States v. Elkins*, 300 F.3d 638, 651 (6th Cir. 2002) *with*

11

*United States v. Christian*, 893 F.3d 846, 856 (6th Cir.), *reh'g en banc granted, opinion vacated,* 904 F.3d 421 (6th Cir. 2018), and *on reh'g en banc,* 925 F.3d 305 (6th Cir. 2019). As to S.B., investigators had previously identified her as a person who had direct knowledge of the DTO, and she was a victim of the sex trafficking going on with the main targets of the DTO. Investigators conducted multiple interviews with S.B.

*Fraizer*, which Mr. Price relies on, is distinguishable because in that case, almost all the information in the affidavit for the search warrant came from two confidential sources. 423 F.3d at 532. No facts supported the confidential informants' reliability, and the confidential informants never witnessed the defendant dealing drugs from the property at issue. *Id.* Here, in contrast, there is much corroboration and distinctly similar stories between the sources. CS #1 stated he or she had observed crack-cocaine, methamphetamine, heroin, and Xanax inside 139 South Princeton. CS #2 explained that Mr. Price lived at and sold illegal drugs from 139 South Princeton. S.B. echoed this during her interview.

Mr. Price's unreliability argument is unpersuasive.

*****

Finally, the Government makes additional arguments that the Affidavits established a sufficient nexus between Mr. Price and 139 South Princeton, and that even if the Court finds the Affidavits were not supported by probable cause, the Court should apply the good-faith exception to the exclusionary rule under *Leon*. (Resp. PageID 1613–16); *see* 468 U.S. at 913. The only two arguments Mr. Price makes to attack the requisite nexus are staleness and unreliability, which do not succeed for the reasons articulated above. A collective and commonsense review of the information in the Affidavits reveals the nexus requirement was satisfied; additional analysis of the Government's other arguments is not needed. And the Court need not address the exclusionary rule given its finding above that the Affidavits were supported by probable cause.

### III. CONCLUSION

For the reasons stated above, Mr. Price's Motion to Suppress is **DENIED**. (ECF No. 484.)

       **IT IS SO ORDERED.**

| | |
|---|---|
| **4/30/2024** | **s/Edmund A. Sargus, Jr.** |
| **DATE** | **EDMUND A. SARGUS, JR.** |
| | **UNITED STATES DISTRICT JUDGE** |